Tucker *v.* Madden.

---

JOSEPH TUCKER, *in Equity, versus* RUFUS MADDEN.

A Court of Equity has a broader jurisdiction than a Court at Law, and while in one a written instrument duly executed, contains the true agreement of the parties, and furnishes better evidence of their intention than any that can be supplied by parol, the other will open a written contract to let in an equity arising from facts perfectly distinct from the construction of the instrument itself.

This court has equity jurisdiction in cases of accident and mistake where the parties have not a plain and adequate remedy at law, and this jurisdiction is to be exercised in the same manner as it is exercised by a court having full and general equity powers. Such jurisdiction will be exercised in this state where the evidence of the mistake is plenary, and leaves no doubt in the mind, of its existence.

BILL IN EQUITY, in which Joseph Tucker complains that on the twenty-ninth day of March, A. D. 1836, Gowen W. McKay and George W. McKay conveyed to him a certain lot or parcel of land, situated in Cherryfield, and bounded as follows, viz.: "Beginning on Narraguagus river at low water mark, at the south east corner of a lot of land now owned and occupied by Thomas Small, of said Cherryfield; thence west-

erly by said Small's south line to land owned by William Freeman; *thence south by said Freeman's land to land which was sold to said Freeman and one Israel Dinsmore;* thence easterly by said Freeman and Dinsmore's land to the Narraguagus river, to low water mark, and thence by said river to the place of beginning, containing one hundred acres, more or less."

And the said Tucker further represents that on the sixteenth day of August, A. D. 1836, the above named Israel Dinsmore and William Freeman sold and conveyed to him, said Tucker, a certain other tract or parcel of land, and *being the same referred to as aforesaid, as sold and conveyed by Gowen W. McKay and George W. McKay to the said William Freeman and Israel Dinsmore,* and bounded and described as follows, viz.: "A certain tract or parcel of land situated in Cherryfield aforesaid, containing about one hundred acres, being the same tract or parcel of land which we purchased of Gowen W. McKay and George W. McKay, as their deed to us now on record will more particularly show—it being also a part of the homestead of the late William McKay, deceased." And the said Tucker further says, that the following sketch is a true copy of the two foregoing tracts of land, taken from the original survey of the same by Lathrop Lewis, and which two tracts or two hundred acres constituted the former homestead of the late William McKay, deceased; the lots being numbered thereon, viz.: 62 fronting the river, and 80 lying back therefrom.

Wm. Freeman, Proprietor's Land.

100 R.

92 R.

No. 81.

100 Acres.

160 Rods.

No. 80.

100 Acres.

174 Rods.

No. 85.

100 R.

92 R.

No. 63.

No. 62.

148 Rods.

162 Rods.

100 Acres.

166 Rods.

No. 61.

Narraguagus River.

And the said Tucker says that the only part of the homestead or farm aforesaid on which there has been any cultivation made by the said William McKay or his heirs or assignees, is the front lot, No. 62, the remaining or back lot, No. 80, being used for an out-lot, pasture and wood lot; and the said Tucker further says, that about sixteen years ago he sold and conveyed to Rufus Madden, of Cherryfield aforesaid, a portion of the homestead farm, or two hundred acres, described as aforesaid, and bounded as set forth in the deed thereof, as follows, viz.: "A certain lot, piece or parcel of land, situated in said Cherryfield, and containing fifty acres, and bounded on the east by the Narraguagus river, and on the north by the farm on which S. O. Madden now lives. The land which is hereby conveyed is the north half of the McKay farm, so called."

And the said Tucker further declares that the farm mentioned in the above description, and occupied by S. O. Madden, was the southerly part of the two lots, No. 63 and No. 81, marked out in the sketch or copy of the lot made by J. A. Millikin as aforesaid, and that the fifty acres which he sold and conveyed to Rufus Madden as aforesaid, were intended and agreed by him and said Madden to be the northerly *part* of the McKay farm; that is, a part of back lots, viz.: the front and back lot, or lots No. 62 and No. 80, and that after the bargain and sale of said fifty acres to said Madden by him, said Tucker as aforesaid, one James A. Campbell, of Cherryfield, a surveyor of land, was employed by them to survey and run out said fifty acres, according to said bargain and sale, and the said Campbell, in the presence of said Tucker and Madden, did proceed to survey and run out said fifty acres, accordingly, and, in doing so, he begun on the front lot at the river, and run off twenty-three rods, or thereabouts, in width, from the northerly part of said lot, and thence keeping this width, and calculating to run west to the head of the back lot or No. 80, to make out said fifty acres, being one quarter part of the McKay homestead or farm, or of the two lots Nos. 62 and 80, containing two hundred

acres; and the said Tucker declares that the said Madden was therewith and at that time content and satisfied with said running, and continued so for about ten years thereafter, occupying and improving the strip of land of fifty acres so run and designated, and continuing through the whole length of both lots, Nos. 62 and 80, as aforesaid, and never claiming during this time any other quantity or description of land for said fifty acres, but the said Tucker acknowledges that said Madden did, about six years ago, complain that he did not have the full width of the land to which he was entitled, and then claimed two rods more width, or twenty-five instead of twenty-three rods, run to him as aforesaid; and he might have been led to this conclusion from the belief that the lots aforesaid were one hundred rods wide, instead of ninety-two rods, as laid down in the original plan of Lothrop Lewis. And the said Tucker says that said Madden on further inquiry and consideration, became apparently satisfied that he had his full width of land, and continued to occupy it as before, not only the strip of twenty-three rods on the front lot or No. 62, but on the back lot or No. 80, to the head thereof, without complaining, till recently, or within one or two years past, that there was any deficiency or error in said running or width; but the said Tucker now says, that the said Madden, in defiance of all the facts enumerated aforesaid, and of his own acknowledgments thereof, now claims that he is entitled, by his purchase of said Tucker, and the deed from said Tucker to him, to have said fifty acres taken from the front lot or No. 62, and not from any portion of the back lot or No. 80, as aforesaid, and in order to enforce this claim, the said Madden, at the last term of this court, instituted and entered an action against him, said Tucker, wherein he demands of the said Tucker the possession of one half part of the front lot or No. 62, as aforesaid, to make out his said fifty acres, and on the pretended ground, as said Tucker supposes and believes, that the McKay farm, so called, consisted of only one hundred acres, and *that* one hundred acres constituted the front lot or No. 62, as afore-

said, and the said Madden undertakes to sustain this claim or right from the description or recording of said Tucker's deed to him, said Madden, of the fifty acres, as aforesaid, wherein said fifty acres are represented to be "the north *half* part of the McKay farm, so called," and the said Madden contends, that it could not be otherwise, because if the McKay farm, so called, consisted of the two lots, or two hundred acres, as aforesaid, one half or the north *half* thereof would be one hundred acres, or double the quantity of land intended to be conveyed to him, said Madden, by him, said Tucker, as aforesaid. And the said Tucker solemnly declares, that this claim for one half of the front lot or No. 62, is fraudulent, unjust, and dishonest on the part of said Madden, and is made, as said Tucker believes, for the wicked purpose of depriving or robbing him, said Tucker, of an additional portion, viz.: one quarter part more of the front lot or No. 62, as aforesaid, being by far the most valuable part of the homestead, or McKay farm, so called; and the said Tucker declares that the injustice and dishonesty of this claim can and will be shown by the proof of the facts already alleged, and by the further testimony which can be adduced, that said Madden always, until within a year or two years past, acknowledged and claimed that his land or the line of said fifty acres run to the head of the back lot, or No. 80, as aforesaid, and in pursuance of said claim, the said Madden has ever since the conveyance to him by said Tucker, continued, as already alleged, to occupy the back strip, as well as the front, by cutting wood thereon, and making other use thereof, and in consequence of his right and claim thereto. And the said Tucker further declares, that the deed which he gave to said Madden, of said fifty acres, was made out by Caleb Burbank, Esq., then of said Cherryfield, and the said Burbank committed a mistake in calling said fifty acres the north *half* of the McKay farm, and that this mistake probably arose from the fact, that he had before him only one of the deeds, mentioned as aforesaid, to said Tucker, conveying the homestead, or the McKay farm, so called, viz.: the deed of Gowen

W. McKay and George W. McKay, conveying one hundred acres, or half of said homestead or farm—a mistake which, under the circumstances, and for the want of due caution, was naturally made.

Now, therefore, that justice may be done in the premises, and that said Tucker may be protected from the fraudulent designs of the said Madden, as aforesaid, the said Tucker prays that, after due notice to him, said Madden, and a hearing and consideration of his answer to this complaint, and the evidence which may be produced to support the same, your Honors would decree such a correction of the mistake herein set forth, as will leave and make the conveyance or deed from said Tucker to said Madden, of the fifty acres, as aforesaid, such as it ought to be, or that you would order and direct, that the said Madden should release and quit claim by deed, duly recorded, so much of said lots No. 62 and 80, or of the homestead, or McKay farm, so called, to him, said Tucker, as will leave to him, said Madden, the fee of fifty acres, to be taken from the north part of said two lots, in a strip of equal width, from the river to the westerly head thereof; or that your Honors would pass such other decree in the premises, for the relief and protection of the said Tucker, as to you shall seem just and proper, and as shall be warranted by the legal principles of equity, or by statute in such case made and provided. And the said Tucker further prays, that you would allow him reasonable damages and costs.

The said Madden admits, in his answer, that the said Gowen W. and George W. McKay conveyed to said Tucker the one hundred acres described in said bill, on the 29th day of March, 1836, as therein alleged.

Of the conveyance from William Freeman and Israel Dinsmore, alleged in said bill to have been made to said Tucker, August 16, 1836, the said Madden, though he has caused diligent search to be made in the registry of said county, has found no record, and believes that such deed is not recorded, and he has no knowledge that such conveyance ever took

place, but, if any such deed was ever given, he believes that it was not executed August 16, 1836, but prior to said deed from Gowen W. and George W. McKay to said Tucker, and his reason for so believing is, that the buildings were situated on said lot, said to be conveyed by Freeman and Dinsmore to said Tucker, and because he has been informed by said Tucker himself, that he bought said lot of Freeman and Dinsmore before he bought the rest of the lot of said McKays; that the sketch in said bill is a fair general representation of the lots of land recited in the deeds referred to, but denies that it presents a fair proportion of the quantities, breadth, length, or exact courses of said lots, but assents that lot No. 62 lies front of and within the same site lines of lot No. 80. He denies that lot No. 80 constituted any part of the homestead of the late William McKay, or was ever called or considered a part of the McKay farm, or homestead.

The respondent admits that William McKay never made any cultivation of lot No. 80, and says in fact that he never owned it, but that it belonged to one John Bracey, who was sentenced to the state prison in Thomaston, and with his family abandoned the occupancy of said lot, and that if said William McKay ever occupied said lot as an out-lot, wood lot or pasture, he did it as a trespasser. He admits that Joseph Tucker conveyed to him, November 24, 1840, "the north half part of the McKay farm, so called," containing fifty acres, and claims to hold the same, and that said lot conveyed is the north half of lot No. 62, and annexes to his answer a copy of said deed under which he claims; that the farm on which S. O. Madden lived, which is the north boundary of his own lot, was the southerly part of lots No. 63 and 81 upon said plan, and also that the fifty acres, which said Tucker conveyed to him, were intended and agreed to be the north half part of the McKay farm, as mentioned in his deed, but he wholly denies that it was intended by him or agreed by him to purchase any part of the back lot or lot No. 80.

*William Freeman*, solicitor for the complainant.

*George F. Talbot*, solicitor for the respondent.

TENNEY, C. J. On November 24, 1840, the plaintiff conveyed to the defendant, by deed of that date, a parcel of land situated in the town of Cherryfield, and described as follows: " Containing fifty acres, and bounded on the east by the Narraguagus river, and on the north by the farm on which Stephen O. Madden now lives; the land which is hereby conveyed is the north half part of the McKay farm, so called."

It is stated in the bill, that the fifty acres which the plaintiff sold and conveyed to the defendant by the deed just referred to, were intended and agreed by him and the said Madden, " to be the northerly part of the McKay farm, that is, a part of both lots numbered 62 and 80 on the plan of Lothrop Lewis;" and that after the bargain and sale of the fifty acres, one James A. Campbell, a surveyor of land, was employed by them to survey and run out the said fifty acres, according to said bargain and sale; and that said Campbell, in presence of the plaintiff and defendant, did proceed to survey and run out the said fifty acres accordingly; and in doing so he began on the front lot, at the river, and run off twenty-three rods or thereabouts in width, from the northerly part of said lot, and thence keeping this width, and calculating to run west to the head of the back lot, No. 80 on said plan, to make out said fifty acres, being *one fourth part* of the McKay farm or homestead, and of the two lots numbered 62 and 80, containing two hundred acres; and that the defendant was therewith, and at the time, content, and satisfied with said running, and continued so for about ten years.

And it is further stated in the plaintiff's bill, that Caleb Burbank, who was employed to write the deed before named, *by a mistake*, inserted in the description of the land intended to be conveyed, the words " half part" of the McKay farm, which would embrace one hundred instead of fifty acres. This mistake the plaintiff seeks to have rectified by a decree of this court.

The defendant in his answer, alleges that the fifty acres, which the plaintiff conveyed to him were intended and agreed to be the north half of the McKay farm, as mentioned in his deed, but denies that it was intended and agreed by him to purchase any part of the back lot, or lot No. 80. He also denies that James A. Campbell ever measured off twenty-three rods from the north line of the defendant's lot, and thence run a line so as to embrace a parcel of land of that width, or that he assented to or acquiesced in said running, or employed said Campbell to run the same. He further denies that Burbank made any mistake, such as is alleged in the bill, in writing said deed to him, and he denies all fraud charged in the bill.

It is a well established rule of law in courts of law, that a written instrument, duly executed, contains the true agreement of the parties; and that the writing furnishes better evidence of the sense of the parties than any that can be supplied by parol. But equity has a jurisdiction which is broader, and will open the written contract to let in an equity, arising from facts perfectly distinct from the construction of the instrument itself. "It must be an essential ingredient," says Lord Thurlow, in *Shelburne* v. *Inchiquin*, 1 Bro., ch. 338, "to any relief under this head, that it should be an accident, perfectly distinct from the sense of the instrument."

In *Hinkle* v. *Royal Exchange Insurance Company*, 1 Ves., 319, Lord Chancellor Hardwicke said the court had jurisdiction to relieve in respect to a plain mistake, in contracts in writing, as well as against fraud in contracts. Those who undertake to rectify an instrument in writing, by showing a mistake, undertake a task of great difficulty.

Lord Elden, in his opinion in the case of the *Marquis of Townsend* v. *Stangroom*, 6 Ves., 328, says, "Lord Hardwicke, saying the proof ought to be the strongest possible, leaves a weighty caution to future judges." "In *Lady Shelburne* v. *Lord Inchiquin*, it is clear Lord Thurlow was influenced by this, as the doctrine of the court, saying it was im-

possible to refuse as competent, parol evidence which goes to prove that words taken down in writing were contrary to the concurrent intention of the parties; but he always thought it must be of the highest nature, for he adds, it must be irrefragable evidence." The doctrines expressed in the foregoing citations, and many others, affirming the same principles, are adopted by Chancellor Kent, in the case of *Gillispie* v. *Moore*, 2 John., R., 585.

This court has equity jurisdiction in cases of accident and mistake, where the parties have not a plain and adequate remedy at law. R. S. of 1841, ch. 96, s. 10. So far as the power of the court extends upon this subject, the jurisdiction is to be exercised in the same manner as it is exercised by a court having full and general equity power. Such jurisdiction has often been exercised in this state, in cases where the evidence of the mistake was plenary, and left no doubt in the mind, of its existence, and the jurisdiction in such cases has not been seriously questioned. *Farley*, in equity, v. *Bryant*, 32 Maine R., 474.

In this case the jurisdiction of the court, as a court of equity, over cases of mistake, in matters suitable for its exercise, is not denied; but it is insisted that the plaintiff in the case, as he has presented it, has a plain and adequate remedy at law; and that the bill is so framed, that he cannot, upon the facts alleged, be entitled to the relief sought. If the mistake stated in the bill is clearly shown, it cannot be denied that the plaintiff is without remedy, unless it can be afforded by a court having equity jurisdiction. For it is manifest, from the description in the deed, in which the mistake is alleged to have been made, that the lines, which are to be the boundaries of the fifty acres conveyed absolutely, must depend upon the location of the McKay farm. The bill is not in the accurate and technical form which is desirable, but the question whether there was a material mistake in the deed is substantially presented, so that it cannot be misapprehended.

Among the exhibits is the copy of a deed from Gowen W.

and George W. McKay to Israel Dinsmore and William Free-man, dated May 25, 1835, and recorded May 28, 1835, which gives the boundaries of the land conveyed, and then follows, "hereby meaning and intending to convey the south half of the farm, whereon we now live, together with one half of the Bracey lot, so called."

On March 16, 1836, Dinsmore and Freeman conveyed to the plaintiff a parcel of land, "being the same tract of land which we purchased of Gowen W. McKay and George W. McKay, as their deed to us, now on record, will more partic-ularly show, it being also a part of the homestead of the late William McKay, deceased." The deed last referred to was to be valid, according to its terms, on the condition that the grantee should pay to the grantors the sum of seven hun-dred and fourteen dollars and forty-seven cents. Whether this condition was fulfilled or not, is not shown.

No question is made by the parties, as to the east line of the lot in question, it being the Narraguagus river, and the southern boundary of Stephen O. Madden's land, which is the northern boundary of the land conveyed to the defend-ant by the plaintiff, is also well understood. The lot, which was first occupied by William McKay as his farm, is admitted to be lot No. 62, fronting on the river, and the Bracey lot is directly in the rear thereof, and is No. 80. This was occu-pied by one Bracey, for a space of twelve or fifteen years; he lived upon it, and had a small field thereon. After Bracey left, he being sentenced to the state prison, which is repre-sented as being thirty years ago, or more, William McKay said he bought that lot; he, however, did not occupy, fur-ther than to allow his cattle to run thereon, not having fenced it, or made any improvement upon it, but it appears that he sometimes took wood therefrom.

If it was intended by the parties to this suit, at the time of the conveyance of the lot in controversy, to convey fifty acres exclusively from lot No. 62, or the front lot, as *from the McKay farm*, the language of the deed is in accordance with that intention. If, on the other hand, it is shown by

15

" irrefragable proof," that they intended that the fifty acres should be taken as described in the deed, *from the McKay farm, composed of the two lots, No.* 62 *and No.* 80, being the original McKay lot, and the Bracey lot, it is equally manifest that the words " half part" of the McKay farm, did not express their design. Hence the question for the determination of the court is, whether it has been shown to its entire satisfaction, that the McKay farm was that constituted by the two lots.

In the deed from Gowen W. and George W. McKay to Dinsmore and Freeman, of May 25, 1835, the Bracey lot is not represented as a part of the farm where the grantors then lived, but as a distinct parcel of land.

The deed from Dinsmore and Freeman of March 16, 1836, to the plaintiff, refers to the deed from Gowen W. and George W. McKay to them, which is represented as being on record, for a description of the land; and the description in the deed thus referred to is a part of the description in the deed making the reference. *Marr* v. *Hobson,* 22 Maine R., 321. And although the deed from Dinsmore and Freeman to the plaintiff contains the words, " it being a part of the homestead of William McKay," yet the reference to the former deed, in which the Bracey lot is not represented as a part of the lot on which the grantors lived, will render these words of little importance, especially as the portion of the land described in those two deeds, exclusive of the Bracey lot, is not that from which the fifty acres conveyed by the plaintiff to the defendant is to be taken, on any construction. From these deeds, no light important to the plaintiff can be obtained.

It appears by the bill, answer and proof, that the defendant has not occupied the southern portion of the fifty acres, as he now claims them. Ordinarily such fact would be very important for a party standing in the position of the plaintiff, as indicating an opinion in the one opposing his claim, that he had no title to the part which he did not take into his possession. And in this case, the evidence is full and un-

contradicted, that the defendant, in his acts, acquiesced in the construction which the plaintiff puts upon the deed, so far as it re_ ards a considerable portion of the land in dispute. And those acts were of such a description, as to satisfy the mind of one seeing those acts alone, that the present claim of the defendant is unfounded. But it is shown by the part of the answer which is responsive to the bill, that a dispute touching the boundary of the lot, upon the south, arose soon after the conveyance, and that the defendant was induced to believe that the land was actually described as being part of the two lots, when, as he alleges, by the contract, as made before the execution of the deed, the whole fifty acres should be taken from the front lot; that he made attempts to obtain satisfaction for his loss, arising from what he treats as an imposition on the part of the plaintiff, but not succeeding in obtaining counsel willing to prosecute his claim, he, for a long time, submitted to the loss, under what he considers now as an erroneous opinion of the true construction of the deed. This explanation, accompanied with the defendant's allegations and denials in the answer, certainly tend somewhat strongly to show that a mistake was not made in the deed.

The testimony of persons living for a long time in the vicinity of the land, as to what constituted the McKay farm, is not in harmony one part with the other, but when all is examined in connection, it affords but little aid of itself.

The evidence derived from James A. Campbell and Salim P. Jordan does not fully support the allegations in the bill, touching the running out of the land, after the conveyance. It shows an acquiesence on the part of the defendant, in the limits contended for by the plaintiff, and unexplained would be important for the plaintiff. But with the explanations in the answer, which is responsive to the bill, its force is much qualified.

In consideration of all which appears in the bill, answer and proofs, we are not satisfied that the mistake stated in the bill as having been made in the deed from the plaintiff to

the defendant, has been so clearly shown as to authorize the reformation in the deed prayed for in the bill.

*Bill dismissed, with costs for the defendant.*