# Bray *v.* Comer.

*Bill in Equity for Cancellation of Mortgage, and Injunction of Sale under Power; Cross-Bill for Foreclosure.*

1. *Consideration of mortgage and secured notes; burden of proof.*—An existing indebtedness is a sufficient consideration to uphold a note and mortgage given to secure it; and the writings importing a consideration when the suit is founded on them (Code, § 3035), the *onus* of proof is on the party who assails or denies it.

2. *Same; how impeached.*—When a mortgage is given to secure a particular debt or liability, it can not be interpreted as a security for another and different liability; yet, when there was a subsisting indebtedness in fact sufficient to sustain it, if it be permissible to show by parol that such indebtedness was not the real consideration, but that the note and mortgage were executed for the accommodation of the mortgagee, to enable him to effect a loan of money on their security, and to be returned to the mortgagor if not so used, " the proof should be clear and convincing—that measure of proof which is required in the reformation of written instruments."

APPEAL from the Chancery Court of Barbour.

Heard before the Hon. JOHN A. FOSTER.

The People's Bank, a corporation located at Eufaula, having become insolvent, and suspended payment, a bill in equity was filed on the 16th January, 1879, by W. H. Thorn-

ton and others, stockholders and creditors, asking the appointment of a receiver, and the settlement of its affairs as an insolvent bank. John G. Smith was appointed re-ceiver, and all the assets of the bank were delivered to him. Among the assets were several notes which had been exe-cuted to the bank by Henry C. Hart, who was its president, together with two mortgages on real estate in Eufaula, which purported to be given to secure the payment of said notes. The receiver advertised the property for sale under the powers contained in the mortgages, and was proceeding to sell it, when, on the 7th February, 1881, a bill in equity was filed against him and others by said Hart, alleging that he owed the bank nothing, that the notes were without con-sideration, and that they were given for the accommodation of the bank, to enable it to effect a loan of money, and were to be returned to him if not so used; and praying an in-junction against the sale, and the cancellation of the mort-gages as a cloud on his title. On the death of said Hart, the suit was revived and prosecuted in the name of G. L. Comer as his administrator. An answer to this bill was filed by the receiver, denying the alleged agreement and want of consideration, alleging that Hart was indebted to the bank in an amount greater than the aggregate of the notes, and that the notes and mortgages were given to secure this indebtedness, to the amount specified in them. Smith afterwards resigned as receiver, and W. J. Bray was appointed in his stead, against whom the cause was re-vived; and said Bray, as receiver, afterwards filed a bill to foreclose the mortgages. The two causes progressed, and were heard together; and on final hearing, on pleadings and proof, the chancellor sustained the defense set up against the enforcement of the mortgages, and rendered a decree in favor of Comer as administrator. From each part of this decree the receiver appeals, and here assigns numer-ous errors, 94 in all. The opinion states the material facts bearing on the points here decided.

S. F. RICE, JNO. D. ROQUEMORE, and H. D. CLAYTON, Jr., for appellant.

G. L. COMER, *contra.* (No briefs on file.)

STONE, C. J.—The People's Bank was a corporation for banking purposes, located and doing business in Eufaula, Alabama. H. C. Hart was its president, and A. A. Walker was its cashier. On July 3, 1878, Hart executed his note payable to the bank, due at five months from date, for the

sum of ten thousand four hundred and twelve 50–100 dol-
lars, and contemporaneously executed to the bank a mort-
gage on real estate, to secure its payment.   The mortgage
was duly probated and recorded.   This note and mortgage
were traded and assigned by the bank to Woods, who gave
in its purchase ten thousand dollars· in money, which the
bank received.   The note matured, was not ·paid by Hart,
and the bank, before its suspension or failure, after noticed,
paid to Woods about six thousand dollars on the note.

On January 9, 1879, Hart executed to the bank four
promissory notes, each for the sum of seven thousand five
hundred dollars, due severally at nine, ten, eleven, and
twelve· months, and executed a mortgage on real estate to
secure their payment.   This·mortgage was also duly pro-
bated and recorded.   An effort was immediately made to
negotiate these notes for the bank's use, the bank being
embarrassed, but it failed ; and on January 14, 1879, the
bank suspended payment, and became insolvent.

Under a power of .sale contained in the mortgage first
executed, Woods sold a part of the property therein con-
veyed, and from the proceeds realized the balance—some
four thousand dollars and interest—due to him on the note
he had purchased of the bank.   He then re-transferred the
note and mortgage to the bank.

A receiver was appointed to take possession of the assets
of the insolvent People's Bank, and to administer the same,
who entered upon the discharge of his duties.   Each of the
mortgages executed by Hart contained a power of sale, and
under them the receiver was proceeding to make sale of the
property conveyed in them, in payment of the debts they
purport to secure.   One H. M. Comer claimed the property
by a title which is subordinate to that of the bank's receiver,
if the said mortgages are valid securities.   The validity of
Comer's claim is not disputed, except that it is claimed that
the mortgages confer a prior and paramount lien on the
property.   Comer and Hart's personal representative (Hart
had died) contend that the bank's receiver can assert no
rights under the mortgages, their contention being that the
notes and mortgages were executed for accommodation, and
upon no consideration moving from the bank to Hart.
This presents the material issue of fact in this cause, upon
which witnesses gave parol testimony, and the chancellor
ruled against the claim of the receiver.   There are bills and
cross-bills, but the case resolves itself at last into the inquiry
stated above.

The proof is clear and full that,. soon after the bank was
organized, Hart and the successive firms of which he was a

member kept running accounts with the bank, which were unsecured, save by the shares of stock he held therein. He was in the habit of making over-draughts, and this was kept up until the bank's suspension. At the time the first note and mortgage were executed—July 3, 1878—he was indebted to the bank in a sum equal to, or greater than they expressed. And on January 9, 1879, when the second batch of notes and mortgage were executed, Hart's indebtedness to the bank was the full sum of forty thousand dollars, the amount represented by all the notes and both the mortgages. So, as matter of fact, there was a consideration, valid in law, and sufficient to uphold the notes and mortgages.

It is clearly the law, that a subsisting debt from Hart to the bank was a sufficient consideration to uphold both the notes and the mortgages.—*Rutledge v. Townsend*, 38 Ala. 706 ; 1 Jones on Mortgages, § 611 ; Byles on Bills, 127; 1 Story on Bills, § 192 ; *In re Carew*, 31 Beav. 39 ; *Percival v. Frampton*, 2 C., M. & R. 180 ; *Currie v. Misa*, L. R. 10 Exchequer, 153. And the execution of the papers imports a consideration.—1 Jones on Mortgages, § 613 ; Code of 1876, § 3035 ; *Bolling v. Munchus*, 65 Ala. 558 ; *Goetter v. Head*, 70 Ala. 532. It results from what we have said, that the burden of disproving a consideration for the notes and mortgages rested with Comer, who antagonized the right of the receiver to foreclose the mortgages.

The precise form in which the defense is presented, does not deny that Hart owed the bank for over-draughts, to the full amount the notes and mortgages represent. The contention is, that the papers were executed by him with no reference to his indebtedness to the bank, but simply for its accommodation, to enable it, by their sale, to relieve itself of the embarrassments it was then laboring under. And, in this connection, it is claimed as part of the agreement, that if the paper was negotiated, the bank was to meet it at maturity ; and if not negotiated, then the notes and mortgages were to be returned to Hart. The following authorities are relied on as justifying this defense : *Wilkerson v. Tillman*, 66 Ala. 532 ; *Edwards v. Dwight*, 68 Ala. 389 ; *Reader v. Helms*, 57 Ala. 440. The argument takes a further step, and contends that the notes and mortgages being made and received as accommodation paper, they can not be upheld by proof of a valuable consideration, not had in contemplation by the parties. There can be no question, that if a mortgage be made to secure a particular debt, or designated liability, it can not, without more, be interpreted as a security for another and different liability.—*Marcus v. Robinson*, 76 Ala. 550 ; *Clark v. Oman*, 15 Gray, 521 ; *Tucker v.*

*Alger,* 30 Mich. 67 ; *Beardsley v. Tuttle,* 11 Wis. 74; *Bacon v. Cottrell,* 13 Minn. 194. The present case is different. There is no attempt here to enlarge the terms of the mortgage, so as to make it embrace a contract, or rather the evidence of a contract, other than that described. It is conceded that the two mortgages were executed to secure the payment of the four notes described in them. The isolated proposition asserted is, that although there was a consideration, valuable and adequate to uphold the notes, in fact the agreement upon which they were given leaves them without consideration to stand on.

From the organization of the bank until its failure, one and the same person was its cashier and chief manager. There were a president, vice-president, and board of directors ; but, from all that appears in the record, the functions of the bank were performed largely, if not chiefly, by the cashier. And his testimony in favor of Comer's version of the transaction is the chief reliance of that side of the controversy.

The testimony of the cashier is positive, and without qualification, that all of Hart's notes and mortgages were given without consideration, and as mere accommodation, to enable the bank to borrow money, with an agreement that, if the notes could not be used, they, with the mortgages, were to be returned to Hart; and if discounted, or disposed of, they were to be paid by the bank when due. This, he testifies, was an agreement made simply with himself, without any knowledge, or assent, or participation on the part of any of the directors.

There are many facts and circumstances calculated to weaken, if not to destroy, the force of this testimony. When the negotiation with Woods was perfected, and the first note and mortgage disposed of to him, its proceeds, ten thousand dollars, were placed as a credit to Hart on the books of the bank. Not only this, but the fees for recording the mortgage, and the expense of the telegraphic correspondence through which the negotiation with Woods was conducted, were also charged to Hart on the books. The books of the bank were under the supervision of the cashier. From them he made out Hart's account, for the information and use of the receiver. He reiterates several times in his testimony that both the books and Hart's account, as made out by him, are correct. Even Hart, by retaining the copy account for a long time without objection, admitted its correctness. That statement of the account is found in the record, and from it we obtain the foregoing information. These indisputable facts are utterly incom-

patible with the theory that Hart simply lent his name for the bank's accommodation. Such acts are much more reliable instruments of proof, than anything which mere human memory can furnish. To these disparaging evidences we must add the letters of the cashier to Cunningham, to the Georgia Central Railroad Bank, and to Smith. The first two of these letters were written only a few days before the bank's failure, and the one to Smith a few days afterwards. These, like the bank entries, are utterly inconsistent with the testimony of the witness; and the Smith letter convicts him of a desire and attempt to obtain control of the Hart mortgages by improper methods; and, if his testimony be true, of a deliberate intention to defraud and betray Hart, in violation of the agreement he testifies he made with him.

Another witness corroborates the cashier, to some extent. It is singular that he alone—an employee of Hart—should know the terms of each of two private agreements of so grave magnitude between Hart and the cashier, when no director of the bank had any intimation of them. He furnishes no reasons or facts, connected with the execution of the first note and mortgage, why he should have known the terms on which they were executed. He simply states they were executed as accommodation, and that the bank was to meet the paper. When he comes to speak of the second mortgage and batch of notes, he is more specific as to place. It is manifest, however, that he falls into a grave error as to the place; and having been shown not to have been present when these papers were executed, he must be in error as to the conversation on the side-walk. Hart was at his residence, in feeble health, and the conversation on the side-walk could not have occurred. No special reason can be assigned why such conversation, if it occurred, should have made a particularly lasting impression on the mind of the witness; while there were many reasons why Smith should be impressed with what did occur. He was vice-president of the bank, knew its straitened circumstances, and was the selected agent to attempt the negotiation of the papers in a distant market. It was his duty to see and know the papers were properly executed, that he might be able to answer inquiries, should they be made. This was the reason given him by the cashier, why he should himself be present at the execution. The deposition of these witnesses were taken between five and six years after the occurrences they relate to, and, as we have said, no special reason can be assigned why the witness, who was clearly

mistaken as to place, should have remembered the alleged side-walk conversation.

The witness, Smith, as we have shown, had strong reasons for remembering what occurred. He was vice-president of the bank, and must be presumed to have felt an interest in its good credit and success. He must have been regarded as a man of solid reputation, for the chancellor appointed him receiver of the bank's assets. He was part of the governing body of the bank, and was selected to attempt the negotiation of the thirty thousand dollars of Hart's notes. If Hart simply lent his accommodation paper to the bank, is it not strange that, when he came to execute the papers, fastening so heavy an incumbrance upon his estate, he should say the papers were all right, and make no mention of the important qualification now attempted to be set up. And Nance, the notary, who was present, and certified the acknowledgment of the mortgage, fully confirms Smith as to the place, and in what he testifies took place when the papers were executed.

From the time the bank was organized, until a few days before its failure, Hart was president of the bank, and there was no change in the office of cashier. During that time Hart was permitted to overdraw his account, until his indebtedness became forty thousand dollars, for which the bank had no security, except Hart's stock in the bank, twelve or fifteen thousand dollars. This was the status of the accounts when the notes and mortgages were executed. It can not be questioned that Hart's indebtedness was an important factor in the bank's suspension and ruin. It is contended for appellants, that inasmuch as the chief officers of the bank, by their breach of duty, have brought on this disaster, they should be adjudged to hold a confidential relation to the creditors and stockholders, and should not be heard to set up the secret agreement attempted in this cause. It may be conceded that, as between Hart and the receiver, such would be the rule. How does the question stand as between the receiver and Comer, who claims as a creditor and purchaser from Hart?

It is contended for appellants, in the second place, that inasmuch as there was a valuable consideration upon which the mortgages could and should have been based, appellees shall not be heard, as against the receiver representing the creditors, to assert that, by virtue of a secret agreement, the mortgages were executed, not on the existing valuable consideration, but upon no consideration whatever. It is not our intention to decide these questions.

If the defense against the mortgagee attempted in this

[Columbus & Western Railway Co. v. Witherow.]

case be permissible, the proof should be clear and convincing; that measure of proof which is required in the reformation of written instruments.—1 Brick. Dig. 685, § 664. Without commenting farther on the testimony found in this record, we have no hesitation in affirming it falls very far short of reaching the required standard, or even of producing reasonable conviction of its truth. We are clearly convinced the chancellor erred in holding it sufficient.—*Rather v. Young*, 56 Ala. 94 ; *Nooe v. Garner*, 70 Ala. 443.

The bill filed by the receiver alleges that Hart's first note and mortgage were assigned to Woods without the bank's authority. The testimony disproves this. In addition, the bank received and retained the money realized in the sale to Woods, with a full knowledge of the source from which it was derived.

The decree of the chancellor must be reversed ; and a decree here rendered, granting relief to the receiver, according to the terms of a decretal order made part of the judgment in this cause.

Reversed and rendered, and remanded for further proceedings.