WILSON ET AL., APPELLANTS, v. MORRIS ET AL., APPELLEES.

1. EQUITY.
Courts of equity possess ample powers either to reform or cancel instruments procured by fraud or mistake, or for a grossly inadequate consideration.

2. SAME—REFORMATION—CANCELLATION.
Whenever a party undertakes to avoid the effect of an instrument which he has signed and sealed, he can only discharge the burden by the production of the most clear, satisfactory and indubitable proof that the defendant is without right to enforce the contract. The rule is the same whether the action be for a reformation or a cancellation of the instrument.

3. APPELLATE PRACTICE.
When the trial court excludes evidence which ought to have influenced its judgment, it is error which cannot be disregarded as harmless.

*Appeal from the District Court of Jefferson County.*

Messrs. THOMAS, BRYANT & LEE, for appellants.

Mr. L. S. SMITH and Mr. A. H. DEFRANCE, for appellees.

BISSELL, P. J., delivered the opinion of the court.

The object of the bill which Morris and his wife filed against the defendants was to procure the cancellation of a trust deed given on the 20th day of April, 1888, on certain lands in Jefferson county, and also the extinguishment of the note made concurrently with the deed, which that instrument secured. The note was for the sum of fifty-five hundred dollars, payable one year after date, at the City National Bank of Denver—provided for interest at the rate of ten per cent per annum, and five per cent attorneys' fees if not paid at maturity. The bill is full of immaterial allegations which can have no purpose, except to show the circumstances of the execution of the two papers. In this respect, the plaintiffs charged many misrepresentations by Wilson concerning

his financial condition and necessities, the reliance which Morris placed upon these various statements, and the friendly relations existing between the parties.    These allegations are of little consequence, and while the substance of them might be competently proved in support of the gravamen of the case, as averments, they may be totally disregarded, since there is a total lack of negation of the truth of most of them, and the case is in reality by the pleading left to stand upon its main statement, that the note was without consideration. This condition is not varied by the evidence in the record, and the case must stand or fall, as the plaintiff may succeed or fail in showing himself entitled to the cancellation, because, as he charges, Wilson gave no value for the note, and the transaction was one simply of a loan of Morris' credit to the extent of the negotiable instrument and the deed securing it. In examining this record, and reaching our conclusions concerning the evidence, we have not been unmindful of the rule so often announced in appellate tribunals, that the decisions of trial courts upon questions of fact are ordinarily entitled to the same respect and weight as is accorded the verdicts of juries on similar controverted questions.    But we regard the present case as one without the rule because it is manifest from the record that the court erred in refusing to admit testimony, which if left unexplained would be of great weight in determining the rights of the parties, and more particularly because it is plain to be seen that the court lost sight of a very controlling principle affecting the burden of proof resting on the plaintiff in a case of this description. The statement of this principle may very well precede the further recital of the facts, since it will serve to illumine both the narrative and the discussion, and render very apparent what has controlled the court in arriving at its conclusion.

It was settled very early in the history of courts of equity, that wherever they acquired jurisdiction of a controversy they were possessed of ample powers to either reform or cancel instruments procured by mistake or fraud, or where it was manifest from the proof that it would be inequitable

for the plaintiff to enjoy the fruits of deeds or other written instruments procured under these circumstances or for a grossly inadequate consideration. The extent of the power or the character of the limitations put upon its exercise under the several circumstances may be safely left unexpressed, since we are concerned with neither. It will probably be conceded without argument that if the plaintiff succeeded in maintaining his bill by competent proof which showed the note and security to be absolutely without consideration, and to be simply and solely a loan of his credit which the defendant was not entitled to enforce against him, he was entitled to the relief which he prayed. This concession demonstrates the importance of keeping the rule and the principle in view in determining such cases, and the weighty consideration which courts should attach to it.

By the common law, parties were always bound by written instruments to which they had affixed their signatures, and they were universally estopped to deny the validity and efficacy of deeds which they had solemnly signed and sealed, or to attack the consideration either expressed in the instrument, or implied from the presence of the seal on the parchment. The importance of this rule in protecting the interests of parties has long been recognized, and may be deemed to be thoroughly established. Wherever there has been a departure from the application of this doctrine, it has resulted from the exercise of the power now well established to exist in all courts of equity to open a written contract, and let in equities which the complainant may be able to establish. At first the power seems to have been more generally exercised in those cases wherein the complainant alleged that the contract as executed did not express the real purpose and agreement of the parties, and he sought to modify what it contained, or insert what was essential to the expression of the true agreement according to his contention. At all events, the rule of evidence with which we are concerned seems to have been first expressed and to be always more generally stated in that class of cases, than in the one where cancellation pure

and simple was the remedy sought. This rule has been variously enunciated, but it is essentially the same in all the cases. As expressed by one of the leading authors on Equity Jurisprudence " The authorities all require that the parol evidence of the mistake and of the alleged modification must be most clear and convincing, in the language of some judges, ' the strongest possible,' or else the mistake must be admitted by the opposite party; the resulting proof must be established beyond a reasonable doubt. Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error." Pomeroy's Eq. Juris., vol. 2, § 859; 3 Green. on Evidence, § 363; *Stockbridge Iron Co. v. Hudson Iron Co.*, 102 Mass. 45; *Tucker v. Madden*, 44 Me. 206; *Henkle v. Royal Ex. Assurance Co.*, 1 Vesey Sen. 317.

From these authorities, as well as from the universal current of the cases, it is plain to be seen that, wherever a party undertakes to avoid the effect of an instrument which he has signed and sealed, he undertakes a task of exceeding difficulty. He can only discharge the burden which is cast upon him by the production of the clearest, most satisfactory and indubitable proof that the defendant is without the right to enforce the contract which he holds. According to the authorities, there is no difference between the two classes of cases—that is, the one where a party seeks to reform a contract to express the actual intention of the parties, and the one where he seeks the cancellation of an instrument as an entirety, because it is not an agreement which the defendant has the right to enforce. *Brainard v. Holsaple*, 4 G. Greene, 485; *Bray v. Comer*, 82 Ala. 183; *Gibbons v. Dunn*, 46 Mich. 147; *Jackson v. Wood*, 88 Mo. 76; *Roberts v. Derby*, 68 Hun, 299.

We shall examine the case under the strong light of this rule of evidence, which we believe the trial court lost sight of in reaching its conclusion. A very complete history and discussion of this controversy may prolong this opinion to an apparently unreasonable length, but it is unavoidable.

For many years the parties had been intimate friends. For several years prior to 1886, Morris was a merchant, and afterwards a banker at Kokomo. While banking at that time, and for the purposes of obtaining an exchange credit in Denver, he procured Wilson to become his security to the extent of ten thousand dollars. The exchange account was probably run with the First National Bank. Morris' bank at Kokomo ceased business about 1886, at which time Morris erected a block or building on some lots which he had bought in Aspen. About the time the building was finished, the Denver Bank pressed him to close up and settle his exchange account, and to this end he borrowed six thousand dollars from Wilson and applied it to that purpose. To secure this loan, he executed to Wilson a trust deed on the building which he had put up in the city of Aspen. We are only concerned with this transaction because of the commingling of it with the later one which was the origin of the present suit, and as throwing some light upon the transaction. We now come to the matter out of which this suit grew. In stating the history of the leases about which the parties disagree, it will not be attempted to state them all, nor to state accurately the respective dates of the original instruments or renewals, and only so many of the details will be given as seem essential to a clear understanding of the dispute. In 1886, Morris and other parties procured a lease on the Bay State Mining Claim in Aspen. Their interests were not equal, nor the responsibilities exactly alike. Both Morris and Wilson had interests, as did other parties named Patrick. The expenses incident to the working of the property under the original agreement of lease were apparently borne by some, if not all of the parties, in amounts which were double their actual interests in the leasehold. The original lease expired, as did also a renewal of it, and in the end one Edward Evans secured a lease on the entire property in his own name. Morris was unable to procure it. After this latter lease was executed, under some sort of a transfer which does not appear, Wilson and Morris secured the whole leasehold title except a six-

teenth, which remained in Evans. The property was then worked under this lease until some time in the summer of 1888, at a most decided loss and at a very considerable expense. The difference between the parties chiefly arises from their dispute as to the proper division of the expenses subsequent to the procurement of the lease by Evans. When the note and deed involved in this action were executed on the 20th day of April, the parties got together apparently to close up some of the outstanding indebtedness. It is undisputed that on that day Wilson issued several checks to the order of Morris, aggregating the sum of nearly three thousand dollars, and that these several amounts were applied in liquidation of the outstanding debts. The chief inquiry is, whether these checks were given to Morris by way of a loan to enable him to liquidate his proportion of the accounts, or whether, under the arrangement between the parties, Wilson was obligated to pay the entire expenses of the mine — Morris reaping the benefit of one half of whatever profits might be derived from the business. There can be no question that, on their face, these checks which were payable to the order of Morris must be taken as a part at least of the consideration of the note that was executed, unless Morris is clearly able to establish the agreement which he asserts, to wit: that Wilson was to pay the entire expenses of working the lease. Whatever weight he may have the right to insist shall be given to his testimony, he does not make a case which is brought within the rule heretofore laid down. The presumptions arising from the execution of a piece of commercial paper may be neither so strong nor so serious as those to be indulged in where the party solemnly affixes his name to a sealed instrument like a deed of conveyance. We do not declare what the rule might be if the suit were brought simply to cancel an ordinary piece of mercantile paper, alleged to be an accommodation note which had been put to the ordinary uses to which such paper is applied. It must be borne in mind however that in this case the note was not what is known as bankable current paper. Banks do not

discount notes running for a year, even though secured by trust deeds on unimproved real property outside of the city limits. We need not therefore intimate what our views would be in a case of that description. In the one at bar, the party executes a note running for a year—bearing ten per cent interest, providing for attorneys' fees, and secures it by a trust deed on real property. He attempts to avoid the force and effect of his debt by stating that this was simply a loan of his personal responsibility. His proof rests solely on his unaided testimony, and to it is opposed the circumstantial denial of the defendant, coupled with a multitude of circumstances which largely tend to uphold it. To appreciate the full force and significance of the various circumstances patent in the case, the situation of the parties must be carefully borne in mind. Wilson was at that time a man of large means—currently reported to be worth several hundred thousand dollars, and did a large banking business with the City National Bank of Denver ; at various times a borrower of from twenty-five to fifty thousand dollars. Morris was a man of apparently limited capital who resorted to the credit of the defendant for the purpose of carrying on his bank in Kokomo, and his operations resulted in an indebtedness of some six thousand dollars, which he was unable to liquidate, and could only secure by a mortgage on the property which he held in Aspen. The evidence undoubtedly discloses that at the time of the transaction Wilson did produce a telegram from the cashier of the City Bank where he did his business, which in terms amounted to a refusal to farther extend him credit for the purposes of his mining operations. This telegram was undoubtedly used at that time as an inducement to procure from Morris the execution of this deed and note. Whether its actual purpose was to enlarge the credit of Wilson at the bank may well be doubted. Its probable purpose was to procure the security which Morris executed. We are left in doubt by the proof as to just what the facts may be concerning this matter, since the investigation of this circumstance was not very persistently nor deeply pursued. There

was no attempt made to show that the note and mortgage were used by Wilson to procure credit, nor were they ever sold or disposed of, nor enforced, until some two years subsequent to maturity, and during all this time they remained in the possession and under the control of Wilson. Morris seems never to have demanded them, nor to have made inquiry as to what had become of them, nor to have been particularly concerned as to the time of the maturity of the note nor as to its enforcement. In support of his assertions that this note was given as security for the indebtedness then existing, and to cover whatever future advances he might be compelled to make on Morris' behalf, Wilson produced the checks which he gave to Morris' order on the 20th of April, amounting as stated to about twenty-nine hundred dollars. He also produced other checks showing subsequent payments, which as he contended amounted to advances to Morris,—so that the sum total of the account between the parties, growing out of their mining operations, amounted to the full amount of the sum in suit. The checks were in the ordinary form, to the order of Morris, were indorsed and used. One of the checks was for the amount of $1,437.25, and exactly corresponded in amount with the sum charged to Morris on the books of the company on that date, and likewise with the credit entered on the books as having been paid by him at that time. Long after these transactions, and within about a month of the maturity of the note, Morris wrote a letter to Wilson in Denver, which generally mentioned the affairs at another mine, and in its conclusion refers to the several debts which he owed to Wilson. In that letter, he states that he ought to be able to pay off the debt on the block about the middle of April, and requests Wilson to let the matter stand until then, when if he is not able to pay he will make other arrangements. He concludes by stating "the other matter, I believe, is due in May." Wilson appears to have been in Aspen, probably after the security matured, and asked Morris to make him a deed of the property, on the ground that the land was not worth any more than

just what Morris owed him. There are many other circumstances in the evidence tending in the same direction. It would seem that the defendant's specific denial aided by the presumptions flowing from the possession and production of the note, the deed and the checks, ought to overcome the case made by the bill and the plaintiff's own testimony. It is true that Morris was slightly aided by the evidence of his co-plaintiff as to those matters about which she was cognizant. But it is difficult to see how this evidence can survive the denial aided by these various instruments. The difficulty is greatly intensified by the circumstances developed by the testimony, which are at present not satisfactorily explained. The plaintiff attempted to explain these checks, and the evidence which the books furnished against him, by stating that the contract between him and Wilson was that Wilson should bear all the expenses for a half interest in the lease. This contract was not established by any evidence but his own, and was not supported by any circumstances tending to corroborate his theory. In our judgment, he wholly failed to prove the contract which he asserted in that clear and precise fashion which the law requires. It was always true that wherever parties sought to reform a contract by inserting terms and conditions which had been left out of it, they were bound to show exactly and precisely the form into which the deed should be put. It must be equally true that when a party seeks to overcome the presumption which he has created against himself by the execution of a deed and to destroy the force of his admissions, and the legitimate presumptions to be drawn from his receipt of checks which he indorses and uses, and which correspond in amount with the apparent extent of his obligation, he must be able to show clearly and precisely what the contract is to which such unusual force is to be given. He should be able to give the date, the circumstances and the form of it, and none of its elements and none of its terms should be left to conjecture. In the present case, he simply states that Wilson was to take the place of the Patricks; but they never had seven and one-

half sixteenths of the property, nor were they ever obligated to carry fifteen-sixteenths of the expenses, and even though his contention might be true, that Wilson was to take the Patricks' place, there would not thereby be put on him the burden of carrying the entire expenses of working the mine. Merchants and bankers, who are men of affairs, and whose dealings are precise, accurate and exact are usually able to give the precise terms of any important engagement into which they may have entered. It is very evident that the plaintiff has failed to make out his case by that clear and convincing testimony, and by the indubitable proof which courts of equity require before they grant relief of this description. What the plaintiff may be able to show on a subsequent hearing we do not know; but we are clearly satisfied that the decree in this case is not sustained by that strong and cogent testimony which courts of equity require before they will set aside solemn instruments to which parties have affixed their signatures.

We are very much sustained in our consideration of the case by the action of the court in excluding testimony which would if unexplained have been of very considerable consequence and influence in settling the rights of the parties. After the various transactions referred to or during their continuance, Morris, at Wilson's request, sent him by mail sundry statements showing the condition of the accounts at the mine. These accounts were proven to have been sent by Morris and to be in his handwriting. On their face, they show an account between Morris and Wilson, in which Morris appears as the debtor, and Wilson's obligation to be a half interest in the lease. In terms, the interest of the parties is expressed to be joint, and their proportion to be one-half. These accounts undoubtedly tended to corroborate Wilson's story that, after the new deal, he was simply obligated to pay one-half of the expenses on the mine, and that Morris was bound to discharge the balance. The accounts were in Morris' handwriting. They accorded with the books, which showed the same thing. Of whatever value or weight they

may have been, they were entitled to be produced by the defendant in maintenance of his theory. If left wholly unexplained by the plaintiff, or if his explanation was not satisfactory, their force would be felt in endeavoring to reach a satisfactory conclusion as to the rights of the parties. The court refused to receive them—the defendant took an exception and assigned this as error. It was error, which we cannot disregard even though the case was tried to the court, since, when a court excludes testimony which we are convinced ought to have influenced his judgment, we cannot say that the error is harmless.

There are no other matters to which we need advert to aid the court below in any subsequent determination of the controversy.

For these errors, the cause must be reversed and remanded for further proceedings in conformity with this opinion.

*Reversed.*